USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: JUN 06 2011

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

     -v-                          :

ERIC S. LIPKIN,                   :

        Defendant.          :

- - - - - - - - - - - - - - - x

**INFORMATION**

S3 10 Cr. 228 (LTS)

**COUNT ONE**
**(Conspiracy to Falsify Records of a Broker-Dealer,**
**to Falsify Records of an Investment Adviser, and**
**to Falsify Statements to Facilitate a Theft Concerning ERISA)**

The United States Attorney charges:

**Relevant Persons And Entities**

1.    At all times relevant to this Information, Bernard L. Madoff Investment Securities LLC, and its predecessor, Bernard L. Madoff Investment Securities (collectively and separately, "BLMIS"), had its principal place of business in New York, New York, most recently at 885 Third Avenue, New York, New York. BLMIS was a broker-dealer that engaged in three principal types of business:  market making; proprietary trading; and investment advisory ("IA") services.  BLMIS was registered with the United States Securities and Exchange Commission ("SEC") as a broker-dealer and was, beginning in or about 2006, registered with the SEC as an investment adviser.

2.    Bernard L. Madoff was the founder of BLMIS, and served as its sole member and principal.  In that capacity,

Bernard L. Madoff controlled the business activities of BLMIS.
On March 12, 2009, in connection with his scheme to conduct a
massive Ponzi scheme through BLMIS, Bernard L. Madoff pleaded
guilty to securities fraud, investment adviser fraud, mail fraud,
wire fraud, two counts of international money laundering, money
laundering, false statements, perjury, false filings with the
SEC, and theft from an employee benefit plan.  Among other
things, Bernard L. Madoff admitted that despite his promises to
clients and prospective clients that he would invest their money
in shares of common stock, options, and other securities of well
known corporations, he in fact never invested those clients'
funds in the securities as he had promised.

3.   Frank DiPascali, Jr. ("DiPascali") was employed at
BLMIS between on or about September 11, 1975, and on or about
December 11, 2008.  During his employment at BLMIS, DiPascali had
a variety of duties and responsibilities.  By the early 1990s,
DiPascali was one of the BLMIS employees responsible for managing
the majority of BLMIS's IA accounts into which thousands of BLMIS
clients invested, and eventually lost, billions of dollars.

4.   Daniel Bonventre ("Bonventre") was employed by
BLMIS from in or about August 1968, through at least on or about
December 11, 2008.  Bonventre began working at BLMIS as an
auditor, and subsequently was given increasing responsibility for
supervising the back office operations of BLMIS.  Bonventre

eventually assumed the position of "Director of Operations" for BLMIS beginning at least as early as in or about the 1980s.

5.   Annette Bongiorno ("Bongiorno") was employed at BLMIS from on or about July 1, 1968, through at least on or about December 11, 2008.  During her employment, Bongiorno had a variety of duties and responsibilities, including managing hundreds of IA accounts purportedly having a cumulative balance of approximately $8.5 billion dollars as of November 30, 2008. Bongiorno also supervised employees who worked for the IA business.

6.   Joann Crupi, a/k/a "Jodi," ("Crupi") was employed at BLMIS from on or about July 5, 1983, through at least on or about December 11, 2008.  During her employment at BLMIS, Crupi had a variety of duties and responsibilities, including tracking the daily activity of the bank account into which billions of dollars of IA clients' money for investment was deposited, and from which IA client redemptions were paid (the "IA Bank Account"), and directing wire transfers into and out of the IA Bank Account.  In addition, Crupi managed several BLMIS IA accounts purportedly having a cumulative balance of approximately $900 million as of November 30, 2008.

7.   At all times relevant to this Information, Jerome O'Hara ("O'Hara") and George Perez ("Perez") were employed by BLMIS starting in or about 1990 and 1991, respectively.  O'Hara

3

and Perez were each responsible for, among other things,
developing and maintaining computer programs for computers that
supported the operations of BLMIS, including its Market Making,
Proprietary Trading, and IA operations.

8.   As a registered broker-dealer and as an investment
adviser, BLMIS was required to make and keep certain books and
records in its ordinary course of business.  Among other things,
those books and records included the following:

a.   Blotters (or other records of original entry)
containing an itemized daily record of all purchases and sales of
securities and all receipts and deliveries of securities
(including certificate numbers), showing the account for which
each such transaction was effected, the name and amount of
securities, the unit and aggregate purchase or sale price (if
any), the trade date, and the name or other designation of the
person from whom the securities were purchased or received or to
whom the securities were sold or delivered (the "contra party");

b.   Documents reflecting each brokerage order,
and any other instruction, given or received for the purchase or
sale of securities, whether executed or unexecuted, including the
account for which the order or other instruction was entered, the
time the order was received, the time at which the order was
entered, the price at which the order was executed and, to the
extent feasible, the time of execution or cancellation;

4

c.   Records identifying the name and address of the beneficial owner of each cash and margin account held at the broker-dealer and/or investment adviser;

d.   Ledgers (or other records) reflecting all assets and liabilities, income and expense, and capital accounts;

e.   Ledgers reflecting moneys borrowed and moneys loaned (together with a record of the collateral therefor and any substitutions in such collateral);

f.   A journal or journals, including cash receipts and disbursements, records, and other records of original entry forming the basis of entries in any ledger;

g.   General and auxiliary ledgers (or other comparable records) reflecting asset, liability, reserve, capital, income and expense accounts; and

h.   All check books, bank statements, cancelled checks and cash reconciliations of the investment adviser.

9.   At all times relevant to this Information, ERIC S. LIPKIN, the defendant, was employed by BLMIS from in or about the mid-1980s, through at least on or about December 11, 2008.  In or about May 1992, LIPKIN began working in the firm's payroll and benefits department, and eventually became the "Payroll Manager" at BLMIS.  In or about 1996, LIPKIN also began working with DiPascali, Bonventre, Bongiorno, Crupi, O'Hara, Perez and others

in managing and maintaining IA accounts, and related books and records.

### Lipkin's Creation of False Account Statements Related to Investment Accounts at BLMIS

10.   ERIC S. LIPKIN, the defendant, working with other co-conspirators, created fraudulent account statements detailing the account values of several IA accounts at BLMIS.   In furtherance of this fraud, LIPKIN prepared letters and statements setting out fake holdings purportedly held in multiple BLMIS IA accounts.

11.   From in or about 1996 through on or about December 11, 2008, ERIC S. LIPKIN, the defendant, created fraudulent letters that were given to IA clients at BLMIS which falsely stated the holdings of their IA Accounts.   In so doing, LIPKIN, and other co-conspirators, calculated the expected value of each of these accounts based on the rate of return promised to the account holders by Madoff, making adjustments for any deposits into or withdrawals out of the account.   Using historical price data for Treasury bills and securities, LIPKIN, and other co-conspirators, then created false portfolios for each IA Account.

12.   These fake portfolios were calculated on spreadsheets maintained by ERIC S. LIPKIN, the defendant, on his computer, and then memorialized in letters to the IA clients. These letters, in turn, were provided to the IA clients, listing the fake portfolio positions and the purported value of the

6

positions in their accounts.  LIPKIN knew, however, that these IA accounts did not actually hold the positions set forth in the portfolios that he and his co-conspirators created, and thus that the letters created by him and provided to the IA clients misstated the holdings of these accounts.

### Lipkin's Creation of Fake DTC Reports at BLMIS

13.  BLMIS was subjected to at least five separate reviews by the SEC and a European accounting firm (the "European Accounting Firm") between 2003 and 2008 (collectively, the "Reviews").[1]

14.  In connection with the Reviews, Madoff caused ERIC S. LIPKIN, the defendant, DiPascali, Bonventre, Crupi, O'Hara, Perez and other co-conspirators, to create additional false and fraudulent BLMIS books and records.  In so doing, (i) LIPKIN, DiPascali, Bonventre, Crupi, O'Hara, Perez and other co-conspirators, created fake "Special" versions of historical BLMIS books and records to show to the SEC and the European Accounting Firm; and (ii) LIPKIN, DiPascali, Bonventre, Crupi, O'Hara, Perez and other co-conspirators, created false documents purportedly obtained from third parties in the ordinary course of BLMIS's business.  The "Special" versions of historical BLMIS documents

---

[1]    The European Accounting Firm's client was a European financial institution that served as custodian for the assets of an IA client (the "European IA Client") and that had a sub-custodian agreement with BLMIS.

were prepared only for a small subset of BLMIS IA clients so that Madoff could conceal the scale of his purported IA business.

15. In connection with the Reviews, Madoff attempted to make it appear that BLMIS did not have custody of its IA clients' assets because he knew that, were the SEC to check with the Depository Trust Company ("DTC"),[2] it would learn that DTC was not holding the securities listed on the BLMIS IA clients' account statements in a segregated account for BLMIS. To explain why DTC was not holding these securities, ERIC S. LIPKIN, the defendant, DiPascali, Bonventre, Crupi, O'Hara, Perez, and other co-conspirators, participated in the preparation of documents in a "receive-versus-payment"/"delivery-versus-payment" ("RVP/DVP") format that showed no securities or cash balances in the accounts of certain IA clients.[3] To be consistent with an RVP/DVP

_____

[2]     Among other things, DTC creates efficiencies in the clearing and settlement of securities transactions by retaining custody of securities on behalf of financial institutions and recording on its books and records changes in the ownership of those securities. BLMIS had an account at DTC in which the securities of the Market Making and Proprietary Trading operations were custodied as well as a few equity securities held on behalf of certain IA clients.

[3]     In a RVP/DVP arrangement, payment for securities purchased is made to the selling customer's agent and/or delivery of securities sold is made to the buying customer's agent in exchange for payment at time of settlement, usually in the form of cash. Because transactions in RVP/DVP accounts are settled directly with the agent on a transaction-by-transaction basis, account statements sent by a broker-dealer like BLMIS to customers with RVP/DVP accounts generally do not reflect any cash balance or security position with the broker-dealer at the end of a period. Thus, an RVP/DVP account is inconsistent with an

scenario, LIPKIN, DiPascali, Bonventre, Crupi, O'Hara, and Perez changed the names of certain IA clients to financial institutions holding assets for the benefit of the IA clients because RVP/DVP accounts required the involvement of such a custodian.

16.   At the direction of Madoff, ERIC S. LIPKIN, the defendant, and other co-conspirators, prepared fake DTC reports. LIPKIN knew the purpose of creating fake DTC reports was to mislead the auditors.

## Lipkin's Creation of False BLMIS Payroll Books and Records and False Statements to the United States Department of Labor

17.   ERIC S. LIPKIN, the defendant, was responsible for processing the payroll and administering the 401(k) plan for BLMIS.   In this capacity, LIPKIN was responsible for preparing and maintaining internal BLMIS payroll records.   LIPKIN was aware that there were individuals on BLMIS's payroll who did not work for the firm but who nevertheless received salaries and benefits. LIPKIN created false internal BLMIS payroll records reflecting that these individuals worked at BLMIS.

18.   ERIC S. LIPKIN, the defendant, also was responsible for submitting an Annual Return ("Form 5500") concerning BLMIS's employee benefit plan to the United States Department of Labor ("DOL").   Form 5500 is part of ERISA's overall reporting and disclosure framework, which is intended to

---

account as to which the broker-dealer holds securities on behalf of a client at DTC in a segregated position.

assure that employee benefit plans are operated and managed in
accordance with certain prescribed standards and that
participants and beneficiaries, as well as regulators, are
provided or have access to sufficient information to protect the
rights and benefits of participants and beneficiaries under
employee benefit plans.

19.  From at least in or about 1996 through on or about
December 11, 2008, at the direction of other co-conspirators,
including Bonventre, ERIC S. LIPKIN, the defendant, created false
BLMIS books and records reflecting individuals who did not
actually work at BLMIS.  Further, Form 5500 required LIPKIN, as
Payroll Manager at BLMIS, to identify accurately the number of
employees at the firm.  LIPKIN included a number of fake
employees in the total number of employees that he reported on
the Form 5500 to the DOL.  LIPKIN submitted this falsified
document on an annual basis despite the warning on Form 5500 that
individuals who knowingly submitted inaccurate information to the
DOL would be subjected to various penalties.

## STATUTORY ALLEGATIONS

### The Conspiracy

20.  From at least in or about 1996 up to and including
on or about December 11, 2008, in the Southern District of New
York and elsewhere, ERIC S. LIPKIN, the defendant, and others
known and unknown, unlawfully, willfully, and knowingly did

combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, falsifying the records of a broker-dealer, in violation of Title 15, United States Code, Sections 78q(a) and 78ff; and Title 17, Code of Federal Regulations, Section 240.17a-3; falsifying the records of an investment adviser, in violation of Title 15, United States Code, Sections 80b-4 and 80b-17; and Title 17, Code of Federal Regulations, Section 275.204-2, and falsifying statements to facilitate a theft concerning ERISA, in violation of Title 18, United States Code, Sections 1027 and 2.

## Objects of the Conspiracy

### Falsifying Records of a Broker-Dealer

21.  It was further a part and an object of the conspiracy that ERIC S. LIPKIN, the defendant, Madoff, DiPascali, Bonventre, Bongiorno, Crupi, O'Hara, Perez, and others known and unknown, unlawfully, willfully, and knowingly, did cause BLMIS, a registered broker-dealer, to fail to make and keep such records as the SEC, by rule, prescribed as necessary and appropriate in the public interest, for the protection of investors, and otherwise in furtherance of the purposes of the Securities Exchange Act of 1934, in violation of Title 15, United States Code, Sections 78q(a) and 78ff.

## Falsifying Records of an Investment Adviser

22.   It was further a part and an object of the conspiracy that ERIC S. LIPKIN, the defendant, Madoff, DiPascali, Bonventre, Bongiorno, Crupi, O'Hara, Perez, and others known and unknown, unlawfully, willfully, and knowingly, by the use of the mails and means and instrumentalities of interstate commerce, in connection with BLMIS's business as an investment adviser, did cause BLMIS to fail to make and keep for prescribed periods such records, furnish such copies thereof and make and disseminate such reports as the SEC, by rule, prescribed as necessary and appropriate in the public interest and for the protection of investors, in violation of Title 15, United States Code, Sections 80b-4 and 80b-17.

## Falsifying Statements to Facilitate a Theft Concerning ERISA

23.   It was further a part and an object of the conspiracy that ERIC S. LIPKIN, the defendant, Bonventre, and others known and unknown, unlawfully, willfully, and knowingly, in documents required by Title I of ERISA to be published, kept as part of the records of employee welfare benefit plans and employee pension benefit plans, and certified to the administrator of such plan, did make and cause to be made false statements and representations of fact, knowing them to be false, and did knowingly conceal, cover up and fail to disclose facts the disclosure of which was required by Title I or ERISA, and was

necessary to verify, clarify, and check for accuracy and completeness reports required by such title to be published and certified, in violation of Title 18, United States Code, Sections 1027 and 2.

### Means and Methods of the Conspiracy

24.  Among the means and methods by which ERIC S. LIPKIN, the defendant, Madoff, DiPascali, Bonventre, Bongiorno, Crupi, O'Hara, Perez, and others, known and unknown, would and did carry out the conspiracy were the following:

a.  LIPKIN created fraudulent letters that were sent to IA clients at BLMIS which falsely stated the holdings of their IA Accounts.

b.  LIPKIN prepared fake DTC reports that were false and fraudulent books and records relating to the operation of BLMIS's IA business.

c.  LIPKIN submitted to DOL fraudulent Forms 5500 that included a number of fake employees who in fact did not work at BLMIS in the total number of BLMIS employees that he reported to the DOL.

d.  LIPKIN created false BLMIS payroll documents reflecting fake employees so that these individuals could fraudulently receive salary and benefits.

**Overt Acts**

25.   In furtherance of the conspiracy and to effect the illegal objects thereof, ERIC S. LIPKIN, the defendant, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   On or about December 31, 1996, in New York, New York, LIPKIN created a fraudulent letter that was sent to an IA client that falsely stated the holdings of the IA account.

b.   In or about late 2006 and 2007, in New York, New York, LIPKIN prepared fake DTC reports that were false and fraudulent books and records relating to the operation of BLMIS's IA business.

c.   On or about July 23, 2007, in New York, New York, LIPKIN submitted a fraudulent Form 5500 that included a number of individuals who in fact did not work at BLMIS in the number of BLMIS employees that he reported to the DOL.

(Title 18, United States Code, Section 371.)

**COUNT TWO**
**(Conspiracy to Commit Bank Fraud)**

26.   The allegations contained in paragraphs 1 through 9 are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

**Lipkin's Submission of Falsified Documents to Secure a Loan**

27.   ERIC S. LIPKIN, the defendant, prepared and submitted a loan application to a lending institution ("Financial

14

Institution #1") insured by the Federal Deposit Insurance
Corporation ("FDIC"), which purported to represent accurately his
personal and financial information.  However, as detailed below,
LIPKIN fraudulently improved his credit worthiness by falsifying
his personal and financial information in a manner that was
material to Financial Institution #1 in making its lending
decision.  Specifically, LIPKIN prepared and submitted false and
misleading information concerning his assets.

  28.  In or about late 2008, ERIC S. LIPKIN, the
defendant, sought a construction loan from Financial Institution
#1 in order to build a home on property he purchased in New
Jersey.  In order to ensure he received the loan, LIPKIN asked
DiPascali to create a new IA account statement in LIPKIN's name
with a falsely inflated account balance.  DiPascali, in turn,
agreed to assist LIPKIN in this fraudulent endeavor.  As a
result, LIPKIN received a fake IA account statement purporting to
show that LIPKIN held approximately $6 million in a BLMIS
account.  In reality, LIPKIN's account at BLMIS had a balance of
approximately $2.2 million at the relevant time.

  29.  Once ERIC S. LIPKIN, the defendant, obtained the
fraudulent account statement, LIPKIN completed an application for
a $1.4 million loan from Financial Institution #1, which included
the fake IA account statement purporting to show that LIPKIN held
approximately $6 million in a BLMIS account.  Once LIPKIN

completed his application, on or about November 24, 2008, LIPKIN sent his application to Financial Institution #1 via email from New York to Florida. Based upon LIPKIN's fraudulent submission, including the fake IA account statement, Financial Institution #1 approved LIPKIN's loan application and granted him the loan.

## STATUTORY ALLEGATIONS

### The Conspiracy

30. In or around late 2008, in the Southern District of New York and elsewhere, ERIC S. LIPKIN, the defendant, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate and agree together and with each other to commit an offense against the United States, to wit, bank fraud, in violation of Title 18, United States Code, Section 1344.

### Object of the Conspiracy

### Bank Fraud

31. It was a part and an object of the conspiracy that ERIC S. LIPKIN, the defendant, and others known and unknown, unlawfully, willfully, and knowingly would and did execute and attempt to execute a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution,

16

by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

## Means and Methods of the Conspiracy

32.   Among the means and methods by which ERIC S. LIPKIN, the defendant, DiPascali, and others, known and unknown, would and did carry out the conspiracy were the following:

a.   LIPKIN prepared and submitted false and misleading information concerning his assets to a FDIC-insured lending institution.

## Overt Act

33.   In furtherance of the conspiracy and to effect the illegal objects thereof, ERIC S. LIPKIN, the defendant, and others known and unknown, committed the following overt act, among others, in the Southern District of New York and elsewhere:

a.   On or about November 24, 2008, LIPKIN sent a fraudulent account statement, prepared in New York, New York, to a FDIC-insured lending institution via email from New York to Florida.

(Title 18, United States Code, Section 371.)

## COUNT THREE
### (Falsifying Records of a Broker-Dealer)

34.   The allegations contained in paragraphs 1 through 19 and 24 through 25 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

17

35.  From at least in or about 1996 through on or about December 11, 2008, ERIC S. LIPKIN, the defendant, unlawfully, willfully, and knowingly, did cause BLMIS, a registered broker-dealer, to fail to make and keep such records as the SEC, by rule, prescribed as necessary and appropriate in the public interest, for the protection of investors, and otherwise in furtherance of the purposes of the Securities Exchange Act of 1934, to wit, LIPKIN caused false and fraudulent books and records to be made and kept by BLMIS, a broker-dealer.

> (Title 15, United States Code, Sections 78q(a) and 78ff; Title 17, Code of Federal Regulations, Section 240.17a-3; Title 18, United States Code, Section 2.)

## COUNT FOUR
### (Falsifying Records of an Investment Adviser)

36.  The allegations contained in paragraphs 1 through 19 and 24 through 25 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

37.  From at least in or about 1996 through on or about December 11, 2008, in the Southern District of New York and elsewhere, ERIC S. LIPKIN, the defendant, unlawfully, willfully, and knowingly, by the use of the mails and means and instrumentalities of interstate commerce, directly and indirectly, in connection with BLMIS's business as an investment adviser, did cause BLMIS to fail to make and keep for prescribed periods such records, furnish such copies thereof and make and disseminate such reports as the SEC, by rule, prescribed as

18

necessary and appropriate in the public interest and for the
protection of investors, to wit, LIPKIN, caused false and
fraudulent books and records to be made and kept by BLMIS, an
investment adviser.

> (Title 15, United States Code, Sections 80b-4 and 80b-17;
> Title 17, Code of Federal Regulations, Section 275.204-2;
> Title 18, United States Code, Section 2.)

## COUNT FIVE
### (False Statements to Facilitate a Theft Concerning ERISA)

38.    The allegations contained in paragraphs 1 through
19 and 24 through 25 above are hereby repeated, realleged and
incorporated by reference as if fully set forth herein.

39.    From at least in or about 1996 through on or about
December 11, 2008, in the Southern District of New York and
elsewhere, ERIC S. LIPKIN, the defendant, unlawfully, willfully,
and knowingly, in documents required by Title I of ERISA to be
published, kept as part of the records of employee welfare
benefit plans and employee pension benefit plans, and certified
to the administrator of such plan, did make and cause to be made
false statements and representations of fact, knowing them to be
false, and did knowingly conceal, cover up and fail to disclose
facts the disclosure of which is required by Title I or ERISA,
and was necessary to verify, clarify, and check for accuracy and
completeness reports required by such title to be published and
certified, to wit, the defendant submitted a fraudulent Form 5500
that included a number of fake employees who in fact did not work

at BLMIS in the number of BLMIS employees that he reported to the DOL.

(Title 18, United States Code, Sections 1027 and 2.)

## COUNT SIX
### (Bank Fraud)

40.   The allegations contained in paragraphs 1 through 9, 27 through 29 and 32 through 33 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

41.   In or about late 2008, in the Southern District of New York and elsewhere, ERIC S. LIPKIN, the defendant, unlawfully, willfully, and knowingly, did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations and promises, to wit, the defendant submitted and caused to be submitted false financial information, among other things, to Financial Institution #1, in order to procure a loan in the amount of approximately $1,400,000.

(Title 18, United States Code, Sections 1344 and 2.)

**FORFEITURE ALLEGATION**
**(Offenses Constituting Specified Unlawful Activity)**

42.   As the result of committing one or both of the offenses constituting specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7), as alleged in Counts One and Three of this Information, ERIC S. LIPKIN, the defendant, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the said offenses, including but not limited to, up to approximately $143.2 billion, a sum of money representing the amount of proceeds obtained as a result of the said offenses.

(Title 18, United States Code, Section 981(a)(1)(C),
and Title 28, United States Code, Section 2461.)

**FORFEITURE ALLEGATION**
**(Bank Fraud)**

43.   As a result of committing one or both of the offenses alleged in Counts Two and Six of this Information, ERIC S. LIPKIN, the defendant, shall forfeit to the United States, pursuant to 18 U.S.C. § 982, any and all property constituting or derived from proceeds obtained directly or indirectly as a result of the said offense, and all property traceable to such property, including but not limited to,

a.   A sum of money representing the amount of proceeds obtained as a result of the said offenses, to wit,

21

approximately $700,000 as to each of Counts Two

and Six, and all property traceable thereto.

b.    Such sum includes, but is not limited to, all

right, title and interest of the defendant in the

following:

i.    All that lot or parcel of land, together with
its buildings, appurtenances, improvements, fixtures,
attachments and easements, located at 314 Steilen
Avenue, Ridgewood, New Jersey, 07450, more particularly
described as Block 3301, Lot 33, on the map of the tax
assessor of the Village of Ridgewood, County of Bergen,
State of New Jersey; and

ii.    All funds, securities and other property held
in any and all accounts at Fidelty Investments in the
name or for the benefit of ERIC S. LIPKIN, Erika
Lipkin, and/or any of their minor children, and all
property traceable thereto.

(Title 18, United States Code, Section 982(a)(2)(A).)

<u>SUBSTITUTE ASSETS PROVISION</u>
<u>APPLICABLE TO FORFEITURE ALLEGATIONS</u>

44.    If any of the forfeitable property described above

in paragraphs 42 through 43 of this Information, as a result of

any act or omission of the defendant:

a.    cannot be located upon the exercise of due

diligence;

b.    has been transferred or sold to, or deposited

with, a third person;

c.    has been placed beyond the jurisdiction of

the Court;

22

        d.     has been substantially diminished in value;

               or

        e.     has been commingled with other property which

               cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21,

United States Code, Section 853(p), to seek forfeiture of any

other property of the defendant up to the value of the

forfeitable property described above.

     (Title 18, United States Code, Sections 981(a)(1)(C),
982(a)(2)(A), Title 21, United States Code, Section 853(p),
    and Title 28, United States Code, Section 2461.)

PREET BHARARA
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

───────────

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

───────────

**UNITED STATES OF AMERICA**

**- v -**

**ERIC S. LIPKIN,**

**Defendant.**

───────────

**<u>INFORMATION</u>**

S3 10 Cr. 228 (LTS)

15 U.S.C. §§ 78q(a), 78ff, 80b-4, 80b-17;
Title 17, Code of Federal Regulations,
Sections 240.17a-3, 275.204-2; 18 U.S.C. §§ 1027, 1344,
371 and 2.

_____  <u>PREET BHARARA</u>
United States Attorney.

_____

───────────